stands. Yes sir. I'm Martin Bowman, I'm here on behalf of the appellant, the certain underwriters at Lloyds. We are here asking the court to reverse the district court's decision, granting summary judgment against our intervention, on the issue of waiver of subrogation. What I'd like to focus on, rather than going through the briefs in this case, is what I think is deemed an additional assured under the policy. As I was reading Cox's brief, and as we were arguing this to the district court, there seems to be a logical leap that is being made across the board with regard to the anti-subrogation rules and the application of the anti-subrogation rules in the district court's opinion. What seems to be the threshold inquiry is what no one seems to be focusing on except us, which is the additional assured status. In the policy itself, in order to be an additional assured under the policy, the vessel has to be actively engaged in the operations. Judge Stewart, I know you wrote the opinion in Ironshore, and Judge Southwick, I believe you . . . at least it appears that you agreed with what Judge Stewart wrote, so I'm going to borrow from that a little bit, and I'm going to say that what we have to do here is take a fine reading, a fine-grained reading, I think was the word that you used, at what exactly the underwriters did here in the policy. There are two operative contracts, but the operative contract here that supplies the in this case is the insurance contract. As we've learned from Ironshore, only the insurer can waive subrogation. The subsumed within the power to waive subrogation or to allow someone to be declared an additional assured or to have a claim released is the power to limit that. And so as we know, because we see these cases arise a lot in the Gulf of Mexico, oftentimes insurers will include policy language that constrains that, that limits it. And that's what we don't see in Cox's position, and that's what we didn't see at the district level was an acknowledgment that there is a very important limitation in the policy itself that precludes Cox from being an additional assured. And when that is, when that is taken into consideration, then the waiver fails, and the release fails, because they are all conditioned on the language in the policy. Now, I know you're about to get this, but let me tell you what would be most helpful to me. It does seem to me that, that citing Marathon isn't all that helpful, because it was allowance of subrogation across the, prohibiting subrogation across the board. But it seems to me your extra language in your policy still leaves a question, the notwithstanding language, no parties shall be deemed additional assured, et cetera, who is not actually engaged or involved in the intended operations of the vessel at the time of the loss. And I don't think your friends on the other side missed this. I think they were arguing that the operations included, for maintenance and cure, what was happening to this individual when he was on the platform or wherever he was off the vessel. So help me with that. Why isn't that . . . it seems to me it's not so much the definition of some of the rest of this. What does it mean to be involved in the operations of the vessel? Well, Judge, I don't know what your background was before you assumed the bench, but that's a classic Marathon lawyer question, right? In that, I'm going to do my best to answer it. I don't know what the exact parameters of that mean. I would suggest to the court . . . Is it the right question? What's that? Is it the right question? I think it's where the . . . I do think it's a great question. I think it's where the district court erred. Let me do this, this way, because there is a body of law that gives us guidance. It may not be in this particular waiver of subrogation type context because it doesn't come up this often, but consider the as owner provision. What is traditionally concerned to be the operation of the vessel? For example, there's a case that was decided by the court involving Chevron where the court held that it wasn't . . . It covered under the P&I policy because the vessel itself, although under charter and on location, it was incidental to the injury which was caused by a crane on a platform. That's a little bit . . . I really do see potentially the argument that this worker who went out as part of the crew of this vessel, maybe not part of the crew, I'm going to use the wrong language, the operations were to go out to this rig or go out to this platform and do whatever and he was doing one of the things that the vessel was providing him to do. That's where I would respectfully disagree. I don't think so. To that, I have to get back into a little bit into the facts of the case. The obligation to pay maintenance and cure arises out of the relationship between the seaman and the employer. Spare me just a second on this issue, but if Mr. Jones, instead of eating breakfast on the platform and going to help him deploy a containment boom, which are the facts in our case, if he decided to eat a food truck and walked ashore and the awning on the food truck had fallen on him, we would still owe him maintenance and cure. There's no more relation between the vessel operations. This vessel, according to the facts, and this is where we think the judge overreached at the district level because as you read her opinion, she seems to be saying that because the vessel was on location and because the vessel was under charter, this must have been incidental to the vessel operations, but what this means, what this means actually engaged or involved in the intended operations is a historical maritime limitation. It means the crew must be acting as crew and the vessel must be doing something. It must be in motion, it must be in navigation. The facts of this case are very different, Judge Southwick. The vessel was a lift boat, it had been jacked the night before, and if you look in the record you'll see that the captain didn't note this activity in the logs. There was no work order for it. This was very incidental. It could have been . . . I mean, we could have had a diesel mechanic on board that would not be entitled to maintenance and cure and he could have been on the rig and they could have said, hey, you know what, we got an uncontrolled release of hydrocarbons. Walk from your breakfast nook over here and help us deploy the boom. The vessel was not engaged. I'm going to submit to you that if a cargo vessel is engaging in loading operations, the vessel's engaged. If a lift boat is engaging in crane operations or is in motion, it's engaged. This vessel was not even manned. They were on the platform having breakfast when Cox exhibited an uncontrolled release of some type of petroleum product and they just asked him to go help. It's similar to a situation where . . . I hate to bring in irrelevancies here in the non-maritime context, but what about an emergency room physician that stops on the side of the He's not . . . he's an emergency room physician, but he's there incidentally. This is not the active engagement and here's where I want . . . if I could just briefly. If you look at the other cases that were cited, if we look at Mid-Continent, if we look at Wiley, what we see is the underwriters in that case said the restriction was while on charter to Chevron was one of the restrictions. One of the other restrictions was while working for someone, but that's not what R says. R says while actively engaged in the intended operations. The intended operations that morning was deploying of a containment boom from a facility that was so far away that from the lift boat, you couldn't even see the facility. There's some pictures in the record that demonstrate this. What I think . . . I can't tell you what the confines of actively engaged are, but I can tell you that this is not it. It sounds to me you're defining the mission of the vessel and what it was chartered to do and you're saying only operations related to what that specific purpose was, even if it takes it off the boat, will be covered by this notwithstanding clause. Is that a fair assessment? I think that's a fair assessment. I think that the clear intent of what the underwriters were doing here was trying to corral the limits of the waiver to that which is normally covered under protection indemnity policy, marine protection indemnity policy. Now, CGL policies are different, they're broader. This is not a situation where the P&I policy was to respond to everything that happened on site. Keep in mind that Cox is being defended by Select's CGL insurer. There is no requirement that all of the insurance be placed with one underwriter. When you get into a situation like this, the underwriters say, hey look, we are only going to be responsible for traditional maritime vessel engagement. That's why I think it's also important to note here that there was no deletion, and we did brief this, but there's no deletion of the as owner clause. The body of law that limits what a marine P&I underwriter can be liable for under the as owner clause tracks the same language that they used in here with regard to the waiver of subrogation, which is active engagement of the vessel. I think if they wanted to limit it to situations where it was on charter, I think they would have said that. Back to the fine grained reading. One of the things Judge Rubin says there, and I wish he were around for me to ask how to resolve it. Me too. Well, I'm going to do the best I can though. He says in there that if the subrogation, the waiver of subrogation isn't broader than the policy itself, then it's useless, because you can't, you haven't insured if you're subject     If you're subject to subrogation, you can't insure. If you're subject to subrogation, you can't insure. You can't insure if you seek subrogation for what you have insured against. So, almost a matter of definition a waiver of subrogation is broader than the coverage of the policy. So, how does that concept fit here, if at all? That gets into the Anti-Subrogation Act. This is where, I felt a little bit like Chevy Chase, in Christmas Vacation. I'm just stuck in a circular argument here because their argument is you cannot subrogate against an insured for matters that are within the coverage, but underwriters only pay for matters that were in the coverage. So, the circularity there is that there is no such thing as subrogation, and the key to get off that circular motion is to acknowledge that in this case, what this language does is it says they're not an additional insured. I can subrogate against them because they are not an additional insured. If you read their brief, in all of the cases that they cite, they all cite the proposition that we can't subrogate against them because they are an additional insured. That's what I want to get through to. That's the initial question. There's a case, and I realize it's from the district court, but Judge Vance did it right in this Emard case. That was a case where there were two vessels alongside engaged in cargo operations, and the injured party was on the adjacent vessel, but it was a cargo vessel, and Judge Vance said, I think correctly so, that the threshold question is to determine insured status, additional insured status. The threshold question is what? Is to determine whether or not there's additional insured status, because you can't answer the waiver, and you can't answer the release until you answer that question, and the way this is worded, it says very clearly, no party shall be deemed an additional insured unless the vessel was actively engaged, and our position is, on the facts, this vessel was not actively engaged. It was on charter, and they could have said it was on charter, would do it. It was on location, but it was not actively engaged, so that is what I think here. What are the confines of this? If this court would take the opportunity to delineate what that means, that would be, I think, very helpful, but I think in this case, these facts do not fit the definition of active engagement. Were we to disagree with you, were we to affirm, I'm stating, saying hypothetically, Hypothetically. We'll see what we do. What case law would we be most in conflict with? I think this court's ruling in Ironshore. I think the court's ruling in Ironshore. I think that this would have a direct impact on the entire body of law that says that the power to determine coverage, waivers, and everything else rests solely with the insurance company. I mean, Judge Stewart, you couldn't possibly have made that proposition clear when you wrote Ironshore, and that's what we're dealing with here. If the court . . . if this language does not mean what it says, then I think we've got a problem. I think it's . . . With fairness to you, you know this case so much better than I do, and as your friends do on the other side, we could fit that, too. I don't think that's true. My concern is, what does it mean to be involved with the operations? And Ironshore isn't talking about that, at least the part of it you were just saying. It's who decides who's the additional insurer. Well, you decided it, and you put it here in the policy, but what does the language mean? So is there any particular case law that if we interpreted operations to include what this fellow was doing, or did do in an emergency situation or whatever we call it, what case law would we be violating? I don't know that I could cite you to a specific case. What I could say is that the . . . On the meaning of operations, I guess . . . Plain language in the intent is not to make this. My underwriters could have said on charter, they certainly could have said on charter, and they could have done what was done in Mid-Continent or some of the other cases. They could have said something along the lines of, while working for Chevron. But if we're to accord this verbiage, any meaning, this language, and to create it, it's different from those other cases. We have to acknowledge the plain language, I think, here. I don't think this fits into actively engaged. The vessel was not being used in any way, shape, or form involved in the deployment of the containment bill. My time is up. Judge, I've enjoyed it. Thank you very much. We would ask, my partner is going to take the rebuttal, and we would ask that the court reverse this on those grounds. Thank you. Thank you, sir. All right. We'll hear from Cox. Ms. Lowe. May it please the Court. Good morning, Your Honors. My name is Amanda Lowe, and I, along with my partner, Karen Shipman, represent the Appellee Cox Operating LLC. I'm going to address an issue that was not even touched on by an appellant, which is an independent basis altogether for the district court granting Cox's summary judgment in this case, and that's the release that is within the MSA that was between Cox and Underwriters Insured Select. But before I get there, and my partner will address the waiver of subrogation and the additional short status, but before I even get there, I think it's really important to point out to the court that something that underwriters are conflating here is the risk and the loss that's at issue. He wants to talk about vessel operations in the context of plaintiff's accident. He's trying to say that we would not be an additional insured under their policy because plaintiff was injured, his injury did not involve the vessel operations. The loss that we're hearing about today is not a liability claim related to plaintiff's accident. It is the payment of maintenance and cure that the underwriters made on behalf of their insured, and that is what they are seeking to recoup from Cox. And for that, Cox was an additional insured and there was a valid waiver of subrogation. And I will allow my partner to further address that, but I wanted to be clear that that is the actual loss we're talking about. We are not, Cox is not making an indemnity claim against Select's P&I underwriter here for indemnity to be defended against the claims of plaintiff. Well, we can, I guess, wait for her, but you decide to raise it. Yeah. You got it right now. I asked your friend on the other side about maintenance and cure, just how that is affected by this language. You wrote in your brief, I guess in the reply brief is where you honed in on it, because, well, not in your reply brief, in replying to what they had said, that maintenance and cure is there, but that perhaps there would not be coverage for the actual injury. So I take that, that you are taking the position that because Jones, kind of lost track now, that's the person who got injured, was a member of this crew and the operations of the vessel, that regardless of where he was injured, with some limitations, I suppose, maintenance and cure is the responsibility of the vessel. And why is that? I mean, where's the line of when it's no longer the responsibility of the vessel owner? Well, as the employer of a Jones Act seaman, it's well established that they owe maintenance and cure to the seaman, regardless of where or how his injury occurs. Well, so long as the work was authorized or he wasn't off on a personal mission, maybe? Yes. Yes. But in this instance, the only reason Jones was in Cox's field was to serve as the captain of the MV Select 102. That is the only service that Select provided to Cox. There were no oil and gas production operators provided by Select, nothing but a Select vessel and its captain and crew. That is the only thing Select provided to Cox in this field. So when I get back, when I ask your friend on the other side, what case law would we most be in violation of were we to affirm, you're saying if we were to reverse, we'd be in violating this understanding of maintenance and cure and how far it extends insofar as injuries if somebody's subject to the vessel's responsibility. Yes. And I think it would also, the case law that would support affirming the district court is also all of the case law that we cited to you in regards to the anti-segregation principle, as well as the fact that because it is undisputed that underwriters are only here as a subrogate of Select, we have no privity of contract with them. We are not one of Select's underwriters. The only avenue they would possibly have to come against Cox is as a subrogate of Select. So they are limited to and controlled by the rights of Select. And that was the argument, frankly, Your Honors, that I wanted to address was the fact that they don't even touch or even say anything about the release in the MSA. And they take the position, they claim that it is a universally accepted truth that they say was created by Halliburton versus Ironshore, a case this court decided. They say that stands for the proposition that only an insured can waive rights of subrogation and that you have to look only to the insured's policy. And that's completely and patently incorrect. In the Halliburton case, the court looked to both the policy and the applicable MSA that Ironshore's insured, Statoil, entered into. And in analyzing Ironhorse's subrogation rights in that case, they said, Ironshore retained subrogation rights unless it was an insurer under the contract and the rights it was seeking to subrogate to had been released or remained assumed by its insured. While they are correct that in that case, Ironshore was able to subrogate on certain claims, they also tossed out many of the claims Ironshore was seeking to subrogate to because those claims involve liabilities that its insured, Statoil, agreed to either release in the MSA or continue to assume liability for. The only ones they allowed Ironshore to go forward and subrogate against Halliburton were for those that Statoil did not release and for those that Statoil did not assume liability for. So really what that case stands for is the overarching legal principle that we set forth in our brief that a subrogee cannot have greater rights than their subrogor. An insurer cannot have greater rights than their insured. So just as the case here, Select, the only avenue they have to come after Cox is as a subrogee of Select. In the applicable MSA between Cox and Select, Select unequivocally released, held harmless, Cox from any and all claims arising out of personal injury to its employees, which would necessarily and undeniably include payments of maintenance and cure benefits to an employee vessel captain. There is nothing here for them to subrogate to. Unlike in Ironshore, where Statoil had not agreed to release Halliburton from environmental pollution claims, had not agreed to remain liable for those types of claims, Ironshore was able to then subrogate and go after Halliburton for those claims. Ironshore could not subrogate, though, and go after Halliburton for the claims that Statoil did release and did on the liabilities it agreed to continue to assume. That is the case here. Underwriters are undeniably, and ensured under this MSA, they are undeniably trying to seek back a loss that Select agreed to release Cox from here, which was any and all claims arising out of the injury to their employees. And just to make a last point, Your Honors, we were a little confused, because today they didn't address this, but in their reply brief, which we obviously could not respond to, they claimed for the first time that perhaps the P&I policy at issue did not cover maintenance and cure benefits. And I just wanted to be clear that the evidence that's actually before the Court, which is the record evidence, is replete with admissions by underwriters where they've stated in numerous pleadings that they did owe the obligation to pay maintenance and cure, that that did fall within the ambit of their policy. That is stated in their complaint of intervention. In their statement in response to our statement on the contected facts, they admit that they were required to pay maintenance and cure, and they admit that that was an obligation under their policy. All right. Thank you, Mia. Thank you. Morning, Your Honors. Karen Shipman, again, on behalf of Cox Operating. That last point my partner was making, I know you had questions for her that hopefully I'm going to address as well, but I think things get really confusing here, because in all of the briefing up until Appellant's reply brief, the loss they were talking about, you know, what involved and didn't involve the operation of this vessel, they kept focusing, as they did today, where did the plaintiff's accident happen? Well, his accident happened on the platform, so it didn't involve the operation of the vessel. That's not what we're here about. This is where they have paid maintenance and cure to this GenZac seaman, and they now want it back from Cox, who has a contract with their subreport. Never before in any of the pleadings until the reply, which obviously we didn't get to respond to until we're here today, do they now claim, well, you know what, that payment of maintenance and cure, that wasn't covered by our policy. It didn't involve operations of the vessel. That's the first time they're saying that. I just want to make it clear that the record, I'm going to go quick, quick, that is foreclosed. It was covered. They necessarily had to determine if they covered it, they paid it, it involved operations of the vessel. They keep saying that the P&I policy only involves the obligations as owner of the vessel to the extent it's operating and involved in the incident that happened. They covered the maintenance and cure. In their complaint of intervention, the record evidence page 809, they say in their own complaint that they had in effect a marine P&I policy pursuant to which they have paid and will continue to pay the maintenance and cure benefits to Mr. Jones. Said policy provides indemnity coverage for obligations incurred by select as it's assured, including obligations to pay maintenance and cure. So someone decided when they filed that complaint, they do cover. Somehow the maintenance and cure involves operations of the vessel because that's what the P&I policy covers. Then we win our summary judgment. The district court in our statement of undisputed facts, paragraph 12, record page 1973, we said, Mr. Jones made a claim for maintenance and cure against select as employer. Intervener admits it had in effect a marine P&I policy pursuant to which it paid and continues to pay Mr. Jones. Their response to our statement of undisputed facts, record evidence page 2083, Cox's 12th statement of uncontested material facts is admitted. So turning the attention suddenly to where the plaintiff got hurt and we can't possibly cover them as an additional insured because he got hurt on the platform, that's not what's before this court. They paid what they determined to be a covered claim. You cannot then seek to segregate to the claims of its insured against me as additional insured for covered claims. That's the whole rule of anti-segregation. That says you can't recover from your own insured covered risks or loss. Now, I know that they keep coming back to, well, you're not an additional insured. We never claimed that their policy covered Cox for the actual, you know, personal injury claim here. They're right. We made that claim against the GL policy of select. They picked us up for that. They defended us against it and all of that. They paid the maintenance and cure claim. They decided it was covered. They want it from Cox now. To be clear, I represent Cox. I don't represent select's GL insurer. Half their briefs say, you know, don't worry, court. If you go ahead and overturn this, Cox won't be left holding the bag. They'll pass it off to select's GL insurer. They're the ones who should have paid it. They're effectively saying, oh, no, we paid a claim that maybe we shouldn't have paid. That's not before this court. That's not what the claim against me is. They admit, in all of the record, they paid a covered claim. The man is at work. He's the Jones-Ox Seaman. The district court looked to the master service agreement. They said, well, and the affidavit from Jeff Wallace, which we submitted a record 1906, who signed the contract on behalf of Cox, that under that MSA, the only services they're providing to Cox are the lift boat and its crew to help as we see fit in our field. They also agreed to get insurance to cover all of their employees and to name Cox as an additional insured and to get a waiver of segregation against Cox. Here, we think the law is clear and the case is clear that the judge basically said, if the man's presence in the field and his ability to claim maintenance and cure, which is covered, does not involve operation of the vessel, then why does he owe the maintenance and cure? It's a covered claim. They already decided. That's what makes everything so awkward. They somehow already decided it was covered. They paid it. This is not a coverage claim. You know, they cite all these cases about the as-owner being deleted. Those cases, if you read them, the Lamass case, the Nakang case, those are all about coverage claims related to the actual accident or risk at issue. That's not what we're here about. And, you know, Judge, you asked, what case can we look at? What case can we look at? In actuality, none of these cases we're citing to the rule of anti-segregation, and also you can't step into the shoes and assume more rights than that of your subreport. There is no case that's, like, directly on point where the covered loss was the payment of this maintenance and cure. So all we can do is look at this course decisions, and we're basically citing the same cases, but, you know, as my partner just said on the Halliburton, the Ironshore case, and you look at all these cases, they read where there's an additional assured argument. They necessarily have to look at the policy, of course, but they also have to look at what is the underlying contract? Where do they say they're entitled to additional insured status? What is the scope of that? They look to master service agreements, towing agreements, charter agreements. Here we have a master service agreement with Select. Select, like my partner said, waived and released any and all claims against Cox arising out of, in any way, the bodily injury of its employees. There is no retained claim. You know, the Ironshore case, Your Honor's found basically that, yes, there were certain things there was a valid waiver of segregation for because the underlying insured, like the Select here, had not released and waived those claims. Like, there was an environmental damage and pollution claims. Those were not, they did not give those up. Their insured retained those. There was something to hold on to and then go against. Here there isn't anything left. Like, nobody wants to talk about the master service agreement. You can't not talk about it. That's what all these cases, we've cited Dow and Marathon, Wiley, the recent decision from Judge Ash out of the Eastern District, where he favorably cites this Court's decisions in those same things. Marathon, Dow and Wiley, all about this rule of anti-segregation. But in all of them, they look to both things. They look to both things. So let's talk real quick about Marathon. I think that's like one of the most closely kind of analogous cases. In that case, Marathon was a platform owner. They chartered a vessel from B&C Boats. They had a charter agreement. In that charter agreement, B&C was required to provide P&I coverage, naming Marathon as an additional insured, and waiving segregation against Marathon. So just like here, that waiver was limited to claims arising out of operations of the vessel. So while the vessel was under charter to Marathon, a seaman on the vessel was hurt, at least in part, by Marathon's platform crane operator. So that case is a little convoluted, because the P&I underwriter, they settled with the plaintiff. They did sort of like a backdoor Mary Carter agreement. They said, okay, we're going to settle with you, Joan Zach Seaman, but part of what we're paying to you, really Marathon owes it, because the crane was involved. They have some fault here. So why don't you, Joan Zach Seaman, keep pursuing Marathon, and for the first $30,000 you get from Marathon, you can give it to us? It's kind of like this backdoor situation. This court said no. The underwriter can't do indirectly what it could not do directly. They had no claim to subrogate to. It said even though the waiver was limited to vessel operations, and the underwriter said, look, we're just getting money from the plaintiff for the fault, Marathon's own fault. No. This court said the underwriter paid a covered claim. The underwriter could not seek to recoup money from its own additional insured that they paid to satisfy an insured claim. They didn't try to, like, parse out, well, really, they're trying to get money back for Marathon's liability as a crane operator. No. Marathon was an additional insured. Even though the waiver of subrogation was limited to claims arising out of operations of the vessel, that waiver just reinforces that rule of anti-subrogation. There, the court held, the waiver is broader than the coverage underwriters owed to Marathon. The underwriters never sought to subrogate and get back the money from Marathon for the crane operator's fault. They tried to backdoor it, and the court said, you can't do that. I think a similar thing is in the Dow case, another one of this court's cases. The underwriters say for losses outside the policy, not covered, the waiver is inappropriate. Like, you can't waive something that's outside the policy's coverage. That case involved a collision of two tugboats, one owned by ARCO, the other by Shotan. Shotan had barges in his tow chartered to Dow. So Dow was required, the party's towing agreement, to obtain hull insurance for these barges that were in Shotan's tow. In that hull insurance, Dow had to name Shotan, the tug owner, as an additional insured and waive separation. The court again looked at the policy and the towing contract. You have to look at both. Dow self-insured for the barge damage and the loss of use of the barges. They said its own insurance, naming and waiving Shotan, only covered Shotan for anything out of the fault of the barges. So they said, you know, to the negligence of the tug, I can still sue you. The court rejected the Dow's argument, and they look at this court's decisions in Marathon, the other decision, Wiley, that we explain in detail in our brief. They said the underwriter waived segregation against a named insured. They cannot seek to recover the loss paid under the policy from its own additional insured, even if that damage to the barges was caused by Shotan. Again, it's the rule of anti-segregation. We could go on, but we discussed in detail Wiley case, another one that basically supports our position, and the Wilson case, which is actually Judge Ash in the Eastern District, following this court's decisions in all those cases. So let's just remember that they paid a covered claim for maintenance and cure. They say their policy only covers things arising out of operations or involvement of a vessel. Well, you covered the maintenance and cure, so you must have figured that that was covered by your policy. You can't get that against Cox. The district court was correct. This court should affirm. Thank you. Let me just ask, as counsel's coming up, both of you are seemingly arguing the same cases. Yes. But I may be missing it. Oh, I think we are. Meeting each other in the seat with the briefs and back and forth and so on and so forth. So I don't know if there are any cases that we're missing. If they are, bring them to our attention. But, you know, seemingly both sides in the briefs are arguing kind of the same cases and so on and so forth. Just one thing. There was a case that my colleague mentioned on direct with a Judge Vance decision. Emar? It's not in any of the briefs. Judge Vance's decision? Judge Vance. You haven't mentioned Judge Vance. Emar? Well, all I'll say at the end of it all, and not taking away your rebuttal, is that if after we finish the arguments, given your vigorous arguments here and upsetting the apple cart of maritime industry and so on and so forth, we want to do like physicians, do no harm, so to speak. So I'm just saying after the argument's over, if there are other cases that either of you feel are helpful to us, you know, feel free and we won't be offended by providing that. That's not an order to do it, but if there are any in light of your interlocking arguments here, you know, following them will be useful to the court. That's all. I'm missing it now in case I would forget to say it at the end. That's it. All right. Not to mention cut off your rebuttal. Thank you, Your Honor. The reason I think that we're all fighting over the same cases is because the law on this is reasonably constrained and we have yet to have a case that actually interprets this specific, excuse me, limiting language in the P&I policy. What we do have is an enormous body of case law interpreting effectively this same language as applies to additional insurance in the scope of coverage under the P&I policy. Now, there's an important delineation here. A shipowner's obligation to pay maintenance and cure is not limited to the operations of the vessel. As my partner said, it is much broader than that. If he's getting a burrito in the morning, the shipowner still owes maintenance and cure. That's not saying that it's covered under the P&I policy. What happened here is the allegations in the complaint allege unseaworthiness, they allege vessel operations, they allege fault of the vessel. Three years later to the day when the plaintiff actually filed the suit, P&I underwriters, having seen allegations of vessel fault, not in the lawsuit, but through the report of the claim, and then when they get the lawsuit, see confirmation of that in the facts of allegations of vessel fault, pay maintenance and cure, because that's what P&I underwriters did. Had the allegations been separate, and had the allegations said, this is not vessel operations, this is deploying demon boom, then the proper policy to respond would be an MEL policy, which covers this very, frankly, narrow gap between the operations of the vessel and an injury that occurs off the vessel. This rarely occurs, but it does occur. Judge Southwick, you asked about marathon oil and a circumstance in which the waiver of subrogation would still be effective and would be broader than coverage under the policy. As it happens, I have that case right now. It's a case where somebody was injured in a lift basket transfer. The owner of the lift basket is not entitled to additional insured coverage because the lift basket has nothing to do with the operations of the vessel, but the accident has everything to do with operations of the vessel, and therefore, if this language were in that policy and this were at issue, there is every reason to believe, and in fact, I would go ahead and stipulate, that the waiver of subrogation would be effective even as the lift basket owner is not entitled to additional insured coverage. Mr. Ford, in the summary judgment order, you said that you intervened, Lord's intervened, asserting that the accident was Cox's fault, and that was the reason for the intervention, even though he'd been paying maintenance and cure. Am I remembering... That's right, Your Honor. ...what the purpose of the intervention was? So that's exclusion, you say, under your policy, for which... No, no, certainly not. A policy that doesn't cover a fault would be no policy at all. I would think. The specific delineation there is unique to those facts where the lift basket operator doesn't have... The lift basket operator may very well have a fault, but they're not involved in the operations of the vessel as regards to the additional insured coverage in that area. Which gets back to your partner's argument. That's fair. Briefly, I'd address... You also asked, what does it mean... What body of case law would be upset by this? And I think it's significant that the limitation we're talking about here is not just with regard to the waiver of subrogation. It also is with regard to additional insured. And the reason for that is there is no body of case law with regard to the waiver of subrogation issue. There's a significant body of case law with regard to what it means for the vessel to be actually engaged or involved in the intended operations in the additional insured context. That's when I asked... That's Randall v. Chevron, and I believe it was Judge Brown who wrote that I can't draw a line, but the vessel must have some causal relationship to the accident. And that's the best line that this Court has come up with, and that's the line this Court has applied many times since. We could come out either way using that line, couldn't we? Well, the vessel has no causal relationship here to Mr. Jones's accident because he slipped in a puddle that was filled with algae that was far, far, far removed from the vessel. And the case is since Linasset said, you've got to be on or near the vessel. That's not to say that the maintenance and cure obligation isn't broader, but for the P&I policy to provide coverage, you've got to be on or near the vessel. That's the meaning of the as-owner clause. All right. Thank you, sir. Thank you very much. All right. Thank you to both sides for your hefty briefing and argument in the case. It's important. We appreciate it. We'll take the case as submitted, and we will try to get it decided. As I said, no requirement to, but if there is something, you know, that illuminates, we'll accept it. All right? A 28-J letter? Yeah, in the form of a 28-J or whatever,  Not directly letter briefs, but if there's . . . You do a lot of maritime work. If there's something that we aren't, that's not in the briefs, we'll accept it. All right. Having said that, that completes the argued cases for the morning. This panel stands in recess until 9 a.m. tomorrow. Thank you.